Slip Op. 23-190

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **GOPRO, INC.,** | |
| Plaintiff, | |
| v. | Before: Timothy M. Reif, Judge |
| **UNITED STATES,** | Consol. Court No. 20-00176 |
| Defendant. | |

### <u>OPINION</u>

[Granting plaintiff's motion for summary judgment and denying defendant's cross motion for summary judgment.]

Dated: December 28, 2023

<u>Alena Augusta Eckhardt</u>, <u>Matthew K. Nakachi</u>, Nackachi Eckhardt & Jacobson, P.C., of San Francisco, CA, argued for plaintiff GoPro, Inc.

<u>Edward Francis Kenny</u>, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., argued for defendant United States.  With him on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>Aimee Lee</u>, Assistant Director and <u>Justin R. Miller</u>, Attorney-in-Charge, International Trade Field Office.  Of counsel on the brief was <u>Mathias Rabinovitch</u>, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, of New York, N.Y.

* * *

Reif, Judge:  This action arises from a challenge by plaintiff GoPro, Inc. ("GoPro" or "plaintiff") of the classification by the United States Customs and Border Protection ("Customs") of eight camera housing models under subheading 4202.99.9000 of the

Harmonized Tariff Schedule of the United States ("HTSUS").[1]  The subject merchandise encompasses GoPro's camera housings for use with its HERO action cameras. Customs classified the subject merchandise within Heading 4202.99.9000, which covers "camera cases" and "similar containers," and carries a 20% *ad valorem* duty. GoPro contests Customs' classifications and argues that the camera housings should be classified within subheading 8529.90.86 as "[p]arts suitable for use solely or principally with the apparatus" of Heading 8525, and is free upon import.  In the alternative, GoPro argues that the camera housings are properly classified within subheading 3926.90.99 as "[o]ther articles of plastic," which carries a 5.3% *ad valorem* duty.

**BACKGROUND**

**I.   Evidentiary objections**

        Pursuant to United States Court of International Trade ("USCIT") Rule 56.3(a), a motion for summary judgment must include a separate document that contains a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  USCIT R. 56.3(a). Citations may be to "particular parts of materials in the record," such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations

---

[1] All citations to the HTSUS, including Chapter Notes and General Notes, are to the edition in place at the time of importation.  *Apple Inc. v. United States*, 964 F.3d 1087, 1090 n.1 (Fed. Cir. 2020).  Plaintiff imported the instant merchandise from October 2018 to February 2019.  Pl.'s Mem. Supp. of Mot. Summ. J. ("Pl. Br.") at 2, ECF No. 29. There were no material changes to the relevant tariff provisions during this period of time.

(including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  USCIT R. 56(c)(1)(A).  Pursuant to USCIT Rule 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  USCIT R. 56(c)(2)

In compliance with USCIT Rule 56.3, the parties have filed their proposed statements of fact and supported those statements with citations to evidence.  *See generally* Pl.'s R. 56.3 Statement of Undisputed Facts ("Pl. Stmt. Facts"), ECF No. 29-1; Def.'s R. 56.3 Statement of Undisputed Facts ("Def. Stmt. Facts"), ECF No. 33. Defendant cited numerous exhibits to support its statement of facts and opposition brief. *See generally* Def. Stmt. Facts; Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. and Supp. of Def.'s Cross-Mot. Summ. J. ("Def. Br."), ECF No. 33.  Plaintiff objects to the admission of several of defendant's exhibits on relevance, foundation and authentication grounds. *See* Pl.'s Evidentiary Objs. to Evid. Proffered by Def. ("Pl. Evid. Objs."), ECF No. 37-2. The court will address each of these grounds in turn.

Pursuant to Federal Rule of Evidence ("FRE") 401, relevant evidence is that which "has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action."  Irrelevant evidence is not admissible.  Fed. R. Evid. 402.  Plaintiff objects to defendant's Exhibits 5, 9, 10, 11A, 11B, 11C, 12, 13, 14, 15, 21, 22, 23, 24, 25, 26, 27 and an embedded photograph of the late Queen Elizabeth ("embedded photograph") for "[i]rrelevance." *See generally* Pl. Evid. Objs.  The court will address plaintiff's relevance objections only

with respect to Exhibits 10, 14 and 15 and will disregard plaintiff's remaining relevance objections.

The court overrules plaintiff's relevance objection to Exhibit 10 (Cousteau Product Requirements at GOPRO 008937).  *See* Pl. Evid. Objs. at 1.  Defendant argues that Exhibit 10 is "relevant as it . . . shows that the housings are designed to among other things protect the camera during storage and transport."  *See* Def. Reply Opp'n Pl.'s Mot. Summ. J ("Def. Reply Br."), at 23, ECF No. 40.  The court considers that Exhibit 10 is relevant.  As an official marketing requirement propagated by plaintiff, Exhibit 10 makes a finding that the housings have a protective design "more . . . probable than it would be without the [exhibit]."  *See* Fed. R. Evid 401(a).  Further, the question of the protective function of the subject merchandise is "of consequence in determining the [instant] action."  *See infra* Section II.C.2.c; Fed. R. Evid. 401(b). Exhibit 10 is relevant and admissible as plaintiff withdrew its prior foundation and authentication objections against this exhibit.  *See* Mot. for Errata, ECF No. 38.

The court also overrules plaintiff's relevance objections to defendant's Exhibits 14 (Canon Advertising Copy for the AW-DC30 All Weather Case) and 15 (AKASO Camera Case Advertising Copy).  Pl. Evid. Objs. at 2.  Exhibit 14 contains the terms "underwater case" and "waterproof case."  *See* Defendant Exhibit ("Def. Ex.") 14 at 1-2, ECF No. 33-11.  Exhibit 15 contains the term "Waterproof Case Underwater Housing for AKASO Action Camera."  *See* Def. Ex. 15 at 1, ECF No. 33-12.  Defendant argues that both exhibits are relevant because they "show[] other retailers and manufacturers identify[ing] similar housings alternatively as 'camera cases.'"  *See* Def. Reply Br. at 24.

The court notes that neither exhibit contains the discrete terms "camera cases" or "camera case"; nonetheless, both exhibits are relevant as each makes "more . . . probable," if only slightly, that retailers and manufacturers of similar camera housings might use the term "case" to describe housings similar to those in dispute.  *See* Fed. R. Evid. 401.

In addition, the court overrules each of plaintiff's foundation objections.  Pursuant to FRE 602, a witness "may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Such evidence "may consist of the witness's own testimony."  Fed. R. Evid. 602.  Plaintiff objects to defendant's Exhibits 11A, 11B, 11C, 14, 15 and the embedded photograph for "[l]ack of [f]oundation."  *See* Pl. Evid. Objs. at 2-3.  Plaintiff's objections are not supported by witness testimony.  Mr. Edward Russell, an expert witness in plaintiff's employ, testified to having personal knowledge related to Exhibits 11A, 11B, 11C, 14 and 15.  *See* Def. Ex. 4, Russell Dep. at 67, 69:22-72:12, 98:17-105:5, ECF No. 33-4.  Further, plaintiff's foundation objection is not applicable with respect to the embedded photograph because the embedded photograph was never the subject of witness testimony and appears only in defendant's opposition brief.  *See* Def. Br. at 22.  In sum, the exhibits at issue do not lack foundation.

Finally, the court overrules each of plaintiff's authentication objections.  FRE 901 requires that the proponent of an item of evidence "must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  Satisfactory evidence for this purpose may include, but is not limited to, the testimony of

a witness with knowledge of the item.  *See* Fed. R. Evid. 901(b)(1).  As defendant

notes, courts generally also allow proponents to authenticate screenshots of web

postings bearing a web address and the date printed for the "limited purpose" of proving

that such postings appeared on the Internet.  *See* Def. Reply Br. at 24-25 (quoting *SMS

Audio, LLC v. Belson*, No. 16-81308-CIV, 2017 WL 1533971, at *3 (S.D. Fla. Mar. 20,

2017)); *see also Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, No. SACV06-0827

AGRNBX, 2008 WL 1913163, at *6 (C.D. Cal. Mar. 27, 2008), *aff'd*, 327 F. App'x 723

(9th Cir. 2009) (permitting authentication of Lexis search results bearing the web

address and date printed).

Plaintiff objects to defendant's Exhibits 11A, 11B, 11C, 14, 15 and the embedded

photograph for "[l]ack of [a]uthentication."  *See* Pl. Evid. Objs. at 2-3.  The court

concludes that Mr. Russell's testimony regarding Exhibits 11A, 11B and 11C

(Deposition Exhibits 54, 55 and 56) constituted sufficient authentication as to those

exhibits.  *See generally* Def. Ex. 4.  Mr. Russell demonstrated knowledge of the exhibits

when he identified them as "vintage rangefinder case[s] to carry a camera in" and then

defined "rangefinder."  *See id.* at 64:3-9, 97:9-103:21; Fed. R. Evid. 901(b)(1).

The court concludes additionally that defendant authenticated Exhibits 14, 15

and the embedded photograph.  Exhibits 14 and 15 display readily both the web

address and the date printed.  *See* Def. Ex. 14; Def. Ex. 15.  Defendant confines its use

of Exhibits 14 and 15 to the "limited purpose of proving" that manufacturers and retailers

have used the term "case" to describe camera housings on the Internet.  *See* Def. Reply

Br. at 24-25; *SMS Audio*, 2017 WL 1533971, at *3.  As for the embedded photograph,

the accompanying URL displays the web address and redirects to a dated webpage.

*See* Def. Br. at 22.  Defendant includes the URL for the "limited purpose" of proving that

the embedded photograph appeared on the Internet.  *See id.*; Def. Reply Br. at 25; *SMS*

*Audio*, 2017 WL 1533971, at *3.  The court overrules each of plaintiff's authentication

objections and concludes that Exhibits 11A, 11B, 11C, 14, 15 and the embedded

photograph are admissible.

## II.   The subject merchandise

USCIT Rule 56(a) requires that the court grant summary judgment if the moving

parties can show that "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Movants should present material

facts as a "separate, short and concise statement, in numbered paragraphs" and cite to

"particular parts of materials in the record" as support.  USCIT R. 56.3(a); 56(c)(1)(A).

The opponent must, in response, "include correspondingly numbered paragraphs

responding to the numbered paragraphs in the statement of the movant."  USCIT R.

56.3(b).

Parties to the instant action submitted separate statements of facts with their

respective cross motions for summary judgment.  *See generally* Pl. Stmt. Facts; Def.'s

Resp. Pl.'s Statement of Undisputed Material Facts ("Def. Resp. Pl. Stmt. Facts"),[2] ECF

---

[2] The court relies on the facts submitted and admitted by both parties.  Certain facts
submitted by plaintiff are disputed by defendant and *vice versa*.  The court does not
reference those facts that are contested and relies only on those uncontested material
facts that shed light on the legal matters that the court resolves in the instant action.

No. 33; Def. Stmt. Facts.[3]  The responses to these statements contain mixtures of

disputed and undisputed terms, phrases or sentences within a numbered paragraph.

*See generally* Pl.'s Resp. Def.'s Statement of Material Undisputed Facts ("Pl. Resp. Def.

Stmt. Facts"), ECF No. 37-1; Def. Resp. Pl. Stmt. Facts; Pl.'s Reply Def.'s Resp. Pl.'s

Statement of Undisputed Facts ("Pl. Reply Def. Resp."), ECF No. 37-3.

        The identity of the imported articles at issue in this action is not in dispute.  *See*

*generally* Pl. Stmt. Facts; Def. Resp. Pl. Stmt. Facts; Def. Stmt. Facts.  Parties

submitted physical exhibits of the subject merchandise to the court for examination in

addition to visual representations in photographs of the subject merchandise in the

parties' USCIT Rule 56.3 Statements of Facts describing the features of the camera

housings.[4]  *See* Pl.'s Composite Ex. A (Physical Samples 1-11), ECF No. 29-2; *see also*

Pl. Stmt. Facts ¶ 8.  In addition, each party submitted a supplemental statement of

undisputed material facts in response to the court's order to support facts that could

have been considered to be disputed and material to the instant action.  Def.'s

Supplemental Statement of Undisputed Facts ("Def. Suppl. Stmt. Facts"), ECF No. 51;

Pl.'s Supplemental Statement of Undisputed Facts ("Pl. Suppl. Stmt. Facts"), ECF No.

52.  The court reviewed each party's separate submissions of facts to determine the

undisputed facts.  Upon review of parties' respective statements of facts and supporting

---

[3] For purposes of this discussion, citations are provided to the relevant paragraph
number of the undisputed facts and response, and internal citations generally have
been omitted.

[4] The court includes images of the subject merchandise below for ease of reference.

documents, and taking into account the above evidentiary rulings, the court finds the following undisputed and material facts regarding the subject merchandise.

The subject merchandise is comprised of GoPro's imported camera housings, which are polycarbonate protective containers for GoPro's HERO action cameras.  Pl. Stmt. Facts ¶ 18; Def. Resp. Pl. Stmt. Facts ¶ 18.  The subject camera housings at issue are for the GoPro HERO action cameras imported by GoPro from October 2018 to February 2019.  Pl. Br. at 2; Def. Br at 1.  Specifically, the instant action concerns camera housings that are designed for use with GoPro's line of HERO 3, HERO 3+, HERO 4 and HERO 5, 6, 7 Black action cameras.  Pl. Stmt. Facts ¶ 8; Def. Stmt. Facts ¶¶ 1, 5, 10, 14, 16, 18, 22, 26.  The GoPro camera housings at issue are form-fitted to the HERO camera models, which they are designed to enclose, and consist of a ridged plastic shell made of polycarbonate with a hardened flat glass over the section of the housing where the camera's lens assembly is situated.  Pl. Stmt. Facts ¶¶ 16-18; Def. Resp. Pl. Stmt. Facts ¶¶ 16-18.  The subject camera housings are form fitting bespoke to those camera models for which they are designed and enclose a single GoPro HERO action camera.  Pl. Stmt. Facts ¶ 16; Def. Resp. Pl. Stmt. Facts ¶ 16.  The camera housings feature "spring-loaded buttons which are mated with corresponding buttons on the camera to control GoPro action camera functions while the camera is housed, such as starting the shutter and turning the camera on and off; the buttons are designed to resist water pressure."  Pl. Stmt. Facts ¶ 20; Def. Resp. Pl. Stmt. Facts ¶ 20; Def. Suppl. Stmt. Facts at 3; *see* Pl. Suppl. Stmt. Facts at 3.  The spring-loaded buttons are also designed to resist, to some degree, pressure so as to minimize the accidental turning on

or off of the action camera enclosed within the housing.  Pl. Suppl. Stmt. Facts at 2; Def. Suppl. Stmt. Facts at 3.  The camera housings have a thin layer of foam on the inner rear door to ensure a tight fit and stabilization and do not provide for impact padding on the outside or inside.  Pl. Stmt. Facts ¶¶ 21-22; Def. Resp. Pl. Stmt. Facts ¶¶ 21-22. The camera housings have thumbscrews or quick-release buckles, which protrude at the bottom of the housings and, with the exception of the Wrist Housing, have a two- or three-finger mounting ecosystem with a screw-style closure; the camera housing end of the system has a two-finger receiver, and all mounts have a three-finger component. Pl. Stmt. Facts ¶ 24; Def. Resp. Pl. Stmt. Facts ¶ 24.  They interlock, attaching the camera housing end to the mount via a quick release buckle or a thumbscrew, enabling the user to use the camera for hands-free recording of the extreme activities.  Pl. Stmt. Facts ¶¶ 23-24; Def. Resp. Pl. Stmt. Facts ¶¶ 23-24.

The merchandise at issue encompasses the following models of GoPro's camera housings (totaling eight models):[5]

- Super Suit (Uber Protection + Dive Housing for HERO 5 Black), Model No. AADIV-001.  The Super Suit housing "was designed with a pressure-resistant water-sealed shell primarily to allow for deep water dives of up to 60 meters of depth" and was "designed with above-water protection for use during kinetic activities including rally car racing and various instances where there is a high degree of impact from rocks, dirt and debris."  Def. Stmt. Facts ¶¶ 2-3; Pl. Resp.

---

[5] Defendant states that, "[w]hile technically eight model numbers are at issue in this case, two models, Model No. 220-09315-000, and Model No. 220-07892-000 are the same as the Standard Housing, Model No. AHSRH-401, but sold in different packaging for such reasons as replacing a damaged item under warranty.  These two models are, therefore, grouped under the Standard Housing."  Def. Br. at 3 (citing Def. Ex. 1, Thomas Dep. at 46, 47, 54, 55; Pl. Stmt. Facts ¶ 8(d)); Def. Stmt. Facts ¶ 26; Pl. Resp. Def. Stmt. Facts ¶ 26.

Def. Stmt. Facts ¶¶ 2-3.  The Super Suit housing is composed of impact-resistant plastic and impact-resistant glass on the front.  Def. Stmt. Facts ¶ 4; Pl. Resp. Def. Stmt. Facts ¶ 4.  It has a pressure-resistant water-sealed shell and incorporates thermal management features for the above water, hot air and sunshine.  Pl. Stmt. Facts ¶ 8(a); Def. Resp. Pl. Stmt. Facts ¶ 8(a).

 

- Dive Housing for HERO 3, HERO 3+ and HERO 4, Model No. AHDEH-301 ("Dive Housing") is a protective dive housing which is waterproof for depths down to 60 meters.  Pl. Stmt. Facts ¶ 8(b); Def. Stmt. Facts ¶ 10; Pl. Resp. Def. Stmt. Facts ¶ 10.  The Dive Housing preceded the Super Suit, and generally offers the same properties, including a 60-meter depth capability for deep-sea filming.  Pl. Stmt. Facts ¶ 8(b); Def. Resp. Pl. Stmt. Facts ¶ 8(b).



- Standard Housing for HERO 3, HERO 3+ and HERO 4, Model No. AHSRH-401 ("Standard Housing") is a GoPro "standard" water housing in that it has the base-level waterproofing of up to 40-meter diving.  Pl. Stmt. Facts ¶ 8(c); Def. Resp. Pl. Stmt. Facts ¶ 8(c).



- Wrist Housing for HERO 3, HERO 3+ and HERO 4, Model No. AHDWH-301 ("Wrist Housing") is designed for deep-sea diving use with the same water pressure resisting capabilities, as well as for land use.  Pl. Stmt. Facts ¶ 8(f); Def. Resp. Pl. Stmt. Facts ¶ 8(f).  Instead of a GoPro two- to three-finger mounting system universal to the Camera Housings, the Wrist Housing was specifically designed to be worn on the wrist via hinge and a Velcro wrist strap,

while actively shooting.  Pl. Stmt. Facts ¶ 8(f).  The hinge feature allows the product to be lifted up off the wrist so that the user can point at their subject and take footage and then latch it back onto the wrist.  *Id.*



- Camo Housing for HERO 3, HERO 3+ and HERO 4, Model No. AHCSH-001 ("Camo Housing") is effectively the Standard Housing, waterproof to 40 meters, with the difference being the color scheme is a camouflage theme, marketed for hunting, fishing and outdoor communities to facilitate the photographer's "blending into the scene."  Pl. Stmt. Facts ¶ 8(e); Def. Resp. Pl. Stmt. Facts ¶ 8(e).



- Housing - Waterproof - HD4, 3.0, Model No. 220-09315-000 (Replacement For Standard Housing AHSRH-401).  Pl. Stmt. Facts ¶ 8(d); Pl. Ex. B, Product Booklet at GoPro 000023; Pl. Ex. E, Thomas Dep. at 15:20-25.

- Water Housing, Bingin 3.0, Al Lens Ring, Model No. 220-07892-000 (Replacement for Standard Housing AHSRH-401).  Pl. Stmt. Facts ¶ 8(d); Pl. Ex. B, Product Booklet at GoPro 000001; *see id.* at 000023; Pl. Ex. E, Thomas Dep. at 15:20-25.

- Skeleton Housing for HERO 3, HERO 3+ and HERO 4, Model No. AHSSK301. Pl. Stmt. Facts ¶ 8(g).



The court considers the various models of the camera housings together in this classification decision, as both plaintiff and defendant concede that the housings share essential characteristics, which ultimately determine which classification is proper.[6]

---

[6] At oral argument, plaintiff and the Government confirmed that the models should be considered by the court together, in consideration of their individual and shared characteristics.  Oral Arg. Tr. at 5:17-7:15, Mar. 15, 2023, ECF No. 47.

### III.    Customs' classification of the subject merchandise and GoPro's protest

GoPro imported the camera housings from late October 2018 through February 2019.  Pl. Br. at 2; Def. Br. at 1.  The camera housings were liquidated as entered pursuant to subheading 4202.99.90 of the HTSUS as "camera cases" between August 2019 and January 2020.  Def. Br. at 1-2; *see also* Pl. Ex. M, Final Ruling HQ H287090 ("Customs Ruling").

GoPro filed a timely protest of the Customs Ruling, which was denied by the Government on March 12, 2020.  Pl. Stmt. Facts ¶ 5; Def. Resp. Pl. Stmt. Facts ¶ 5.

GoPro timely protested the liquidations arguing that its camera housings are properly classified under subheading 8529.90.86, HTSUS, which provides for "[p]arts suitable for use solely or principally with the apparatus of headings 8525 to 8528: Other: Other," or alternatively under subheading 3926.90.99, HTSUS, which provides for "[o]ther articles of plastics and articles of other materials of headings 3901 to 3914: Other."  Pl.'s Resp. Def.'s Cross-Mot. Summ. J. and Reply in Supp. Pl.'s Mot. Summ. J. ("Pl. Resp. Br.") at 21, ECF No. 37.

On September 8, 2020, GoPro timely commenced this action before the Court within 180 days of the date of denial of the protest regarding the camera housings entries between 2018 and 2019.  Pl. Br. at 6; Pl. Stmt. Facts ¶ 6; Def. Resp. Pl. Stmt. Facts ¶ 6.  GoPro paid all liquidated duties on the subject entries before commencement of this action in accordance with 28 U.S.C. § 2673(a).  Pl. Stmt. Facts ¶ 7; Def. Resp. Pl. Stmt. Facts ¶ 7.  Plaintiff filed its amended complaint on July 15, 2021. Pl.'s Am. Compl. ("Pl. Am. Compl."), ECF No. 19.

On March 15, 2023, the court heard oral argument.  *See* Oral Arg. Tr., Mar. 15, 2023, ECF No. 47.

## JURISDICTION AND STANDARD OF REVIEW

The Court exercises exclusive jurisdiction over all civil actions commenced under section 515 of the Tariff Act of 1930, 19 U.S.C. § 1515, to contest protests denied by Customs, 28 U.S.C. § 1581(a),[7] and reviews such actions *de novo*.  28 U.S.C. § 2640(a)(1) ("The Court of International Trade shall make its determinations upon the basis of the record made before the court . . . .").

Summary judgment is permitted when "there is no genuine dispute as to any material fact."  USCIT R. 56(a).  In the absence of genuine factual issues, whether to grant summary judgment turns on the proper construction of the HTSUS, which is a question of law.  *Clarendon Marketing, Inc. v. United States*, 144 F.3d 1464, 1466 (Fed. Cir. 1998).  The court must decide materiality by determining whether any factual disputes are material to the resolution of the action.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  *Id.* at 248.  Factual disputes that are irrelevant or unnecessary will not be counted.  *Id.*

---

[7] References to the U.S. Code are to the 2018 edition.  Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of Title 19 of the U.S. Code.

Here, the court does not find any disputes as to material issues of fact, so summary judgment is appropriate to resolve the dispute over the classification.  In the instant case, both parties filed for summary judgment under USCIT Rule 56. "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)); USCIT R. 56(a).

The HTSUS has the force of statutory law.  *See Aves. In Leather, Inc. v. United States*, 423 F.3d 1326, 1333 (Fed. Cir. 2005).  "Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings."  *La Crosse Tech., Ltd. v. United States,* 723 F.3d 1353, 1358 (Fed. Cir. 2013) (quoting *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999)). When interpreting a tariff term, the court may rely on its own understanding of the term and on secondary sources such as scientific authorities and dictionaries.  *N. Am. Processing Co. v. United States*, 236 F.3d 695, 698 (Fed. Cir. 2001).

In adjudicating a tariff classification dispute, the court first considers whether "the government's classification is correct, both independently and in comparison with the importer's alternative."  *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984) ("*Jarvis*").  The plaintiff has the burden of showing that the government's classification of the subject merchandise was incorrect.  *Id.* at 876.  Subject to the plaintiff's rebuttal, factual determinations by Customs are presumed correct, *see* 28

U.S.C. § 2639(a)(1), but the presumption of correctness applies to issues of fact and not

questions of law.  *Goodman Mfg., L.P. v. United States*, 69 F.3d 505, 508 (Fed. Cir.

1995).  If the plaintiff satisfies its burden of demonstrating that the government's

classification was incorrect, the court must ascertain "the correct result, by whatever

procedure is best suited to the case at hand."  *Jarvis*, 733 F.2d at 878 (footnote

omitted).  "While [the Court] accord[s] deference to a classification ruling by Customs

relative to its 'power to persuade,' [the court has] 'an independent responsibility to

decide the legal issue of the proper meaning and scope of HTSUS terms.'"  *Kahrs Int'l.,*

*Inc. v. United States*, 713 F.3d 640, 644 (Fed. Cir. 2013) (quoting *United States v. Mead*

*Corp.*, 533 U.S. 218, 235 (2001); *Warner–Lambert Co. v. United States*, 407 F.3d 1207,

1209 (Fed. Cir. 2005)).

     The Court's review of classification cases is limited to the record before the court.

28 U.S.C. § 2640(a).  "The plaintiff has the burden of establishing that the government's

classification of the subject merchandise was incorrect . . . ."  *Lerner N.Y., Inc. v. United*

*States*, 37 CIT 604, 606-07, 908 F. Supp. 2d 1313, 1317-18 (2013).  But, plaintiff "does

not bear the burden of establishing the correct classification; instead, it is the court's

independent duty to arrive at the 'correct result.'"  *Id.* (quoting *Jarvis*, 733 F.2d at 878).

     Resolution of proper classification entails a two-step process: (1) ascertaining the

proper meaning of specific terms in the tariff provision; and (2) determining whether the

merchandise at issue comes within the description of such terms as properly construed.

*Link Snacks, Inc. v. United States*, 742 F.3d 962, 965 (Fed. Cir. 2014); *Pillowtex Corp.*

*v. United States*, 171 F.3d 1370, 1373 (Fed. Cir. 1999); *Orlando Food Corp. v. United*

*States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998).  "However, when there is no dispute as to

the nature of the merchandise, then the two-step classification analysis 'collapses

entirely into a question of law.'"  *Link Snacks,* 72 F.3d at 965 (quoting *Cummins Inc. v.*

*United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006)).

      Additional U.S. Notes to the HTSUS are also "considered to be statutory

provisions of law for all purposes."  *Del Monte Corp. v. United States*, 730 F.3d 1352,

1355 (Fed. Cir. 2013) (internal quotations omitted) (citations omitted).  These are "legal

notes that provide definitions or information on the scope of the pertinent provisions or

set additional requirements for classification purposes."  *Id.*

      The court may also refer to the Explanatory Notes to the Harmonized Commodity

Description and Coding System, developed by the World Customs Organization.

Explanatory Notes may guide the interpretation of a tariff term since they are "intended

to clarify the scope of HTSUS subheadings and to offer guidance in their interpretation,"

even though the Explanatory Notes are not legally binding.  *Len-Ron Mfg. Co. v. United*

*States*, 334 F.3d 1304,1309 (Fed. Cir. 2003).  The Explanatory Notes are "generally

indicative of the proper interpretation of a tariff provision."  *Degussa Corp. v. United*

*States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007).

## DISCUSSION

## I.   Application of GRI 1, HTSUS, to classify the subject camera housings

      As required by GRI 1, HTSUS, the court first considers the terms of the headings

and any relative section and chapter notes in ascertaining the correct four-digit heading

for the classification of the imported camera housings.  The candidate headings of the

HTSUS identified by the parties, with the respective article descriptions (in relevant

part), are as follows:

**HTSUS Heading 4202[8]**

| 4202 | Trunks, suitcases, vanity cases, attaché cases, briefcases, school satchels, spectacle cases, binocular cases, *camera cases*, musical instrument cases, gun cases, holsters and *similar containers*; traveling bags, insulated food or beverage bags, toiletry bags, knapsacks and backpacks, handbags, shopping bags, wallets, purses, map cases, cigarette cases, tobacco pouches, tool bags, sports bags, bottle cases, jewelry boxes, powder cases, cutlery cases and similar containers, of leather or of composition leather, of sheeting of plastics, of textile materials, of vulcanized fiber or of paperboard, or wholly or mainly covered with such materials or with paper: |

* * *

| 4202.99 | Other: Of materials (other than leather, composition leather, sheeting of plastics, textile materials, vulcanized fiber or paperboard) wholly or mainly covered with paper: |

* * *

| 4202.99.9000 | Other . . . . . . . . . . . . . . . . . . . 20% *ad valorem* |

HTSUS 4202.99.9000 (first and second emphases supplied).

**HTSUS Heading 8529[9]**

| 8529 | Parts suitable for use solely or principally with the apparatus of headings 8525 to 8528: |

* * * *

---

[8] Customs classified the subject camera housings under 4202 as "camera cases."  *See* Pl. Stmt. Facts. ¶ 50; *See* Def. Resp. Pl. Stmt. Facts ¶ 50.

[9] GoPro proposes 8529 as the correct heading for the camera housings.  Pl. Br. at 8.

8529.90        Other:

\* \* \* \*

8529.90.8600        Other. . . . . . . . . . . . . . . . . . . . . . . . . . . . . free

HTSUS 8529.90.8600.

Alternatively, plaintiff argues that the subject merchandise should be

classified in subheading 3926.90.99.  Pl. Br. at 4.

**HTSUS Heading 3926**

3926        Other articles of plastics and articles of other materials of
            headings 3901 to 3914:
\* \* \*

3926.90        Other:

\* \* \*

3926.90.99        Other. . . . . . . . . . . . . . . . . . 5.3% *ad valorem*

HTSUS 3926.90.99.

The parties have not provided, and the court has not identified, any other

candidate headings that might be suitable for the subject camera housings.

The court concludes that the camera housings are classified as "[p]arts suitable

for use solely or principally with the apparatus of [H]eading[] . . . 8525."  HTSUS

8529.90.8600.  In reaching this conclusion, the court first considers Customs' original

classification of the camera housings under Heading 4202 and then elucidates its

reasoning for classifying the subject camera housings as "parts" under Heading 8529,

instead.

## II.   Customs' original classification of the camera housings under Heading 4202

### A.   Legal framework

"Absent contrary legislative intent, [the court] construe[s] HTSUS terms according to their common and commercial meanings, which [the court] presume[s] are the same." *Otter Prods., LLC v. United States,* 834 F.3d 1369, 1375 (Fed. Cir. 2016) ("*Otter Prods. CAFC*").

In an *eo nomine* analysis, the court first construes the headings at issue as a matter of law by defining the elements of the heading; the court then moves to the second classification step, a factual inquiry, to determine whether the subject merchandise is consistent with those elements.  *See, e.g.*, *R.T. Foods, Inc. v. United States*, 757 F.3d 1349, 1352 (Fed. Cir. 2014); *Link Snacks*, 742 F.3d at 965.

In the context of determining the meaning of terms in tariff headings, "the correct meaning of the term is its common commercial meaning."  *GRK Canada, Ltd. v. United States*, 761 F.3d 1354, 1357 (Fed. Cir. 2014) (citation omitted); *see also Otter Prods. CAFC,* 834 F.3d at 1375.

To determine the common commercial meaning of a tariff provision, the court "'may rely upon its own understanding of terms used, and may consult standard lexicographic and scientific authorities.'"  *Airflow Tech., Inc. v. United States,* 524 F.3d 1287, 1291 (Fed. Cir. 2008) (citation omitted).  "[T]he use [of articles] may be considered as part of the definition of *eo nomine* provisions, where, even if the *eo nomine* provision describes goods with respect to their names, the name itself may

inherently suggest[] a type of use."  *GRK Canada*, 761 F.3d at 1359 (quoting *Carl Zeiss*,

195 F.3d at 1379).

Heading 4202 states in relevant part:

4202   Trunks, suitcases, vanity cases, attaché cases, briefcases, school satchels, spectacle cases, binocular cases, *camera cases*, musical instrument cases, gun cases, holsters and *similar containers*; traveling bags, insulated food or beverage bags, toiletry bags, knapsacks and backpacks, handbags, shopping bags, wallets, purses, map cases, cigarette cases, tobacco pouches, tool bags, sports bags, bottle cases, jewelry boxes, powder cases, cutlery cases and similar containers, of leather or of composition leather, of sheeting of plastics, of textile materials, of vulcanized fiber or of paperboard, or wholly or mainly covered with such materials or with paper:

* * *

4202.99       Other:
                 Of materials (other than leather, composition leather, sheeting of plastics, textile materials, vulcanized fiber or paperboard) wholly or mainly covered with paper:

* * *

4202.99.9000              Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20% *ad valorem*

HTSUS 4202.99.9000 (first and second emphases supplied).

In an *eo nomine* analysis, the court first construes the headings at issue as a

matter of law by defining the elements of the heading, *infra* Section II.C.1.a; the court

then moves to the second classification step, a factual inquiry, to determine whether the

subject merchandise is consistent with those elements, *infra* Section II.C.1.b.  *See, e.g.*,

*R.T. Foods*, 757 F.3d at 1352; *Link Snacks*, 742 F.3d at 965.

Customs' ruling letters, as explanations of classification decisions, are entitled to

a level of "respect proportional to [their] 'power to persuade.'"  *Mead Corp.*, 533 U.S. at

235 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

### B.    Positions of parties

Plaintiff states that Federal Circuit decisions establish that any exemplar of Heading 4202 (including the *eo nomine* provisions) must possess each of the four essential characteristics (that unite all exemplars, *ejusdem generis*): store, transport, protect, and organize multiple items within.  Pl. Stmt. Facts ¶ 39; Pl. Resp. Br. at 1-2. Plaintiff urges the court to apply the four-factor test as established in *Otter Products* to the court's *eo nomine* analysis of "camera case," as well as in the context of the court's *ejusdem generis* analysis of "similar containers."  Pl. Resp. Br. at 1-2, 5-6.

Defendant states that "'[c]amera cases' are included among those *eo nomine* articles specifically listed without limitation in [H]eading 4202 and includes all forms of camera cases including camera cases that have been improved or amplified.  GoPro's housings for its cameras are simply a form of 'camera case' and encompassed within [H]eading 4202."  Def. Br. at 17; *see Chevron Chem. Co. v. United States*, 23 CIT 500, 505, 59 F. Supp. 2d 1361, 1367 (1999) (stating that "[a]n *eo nomine* provision that names an article without terms of limitation, absent evidence of a contrary legislative intent, is deemed to include all forms of the article").  Defendant argues that GoPro conflates what would be necessary to show for a "similar container" such as a "camera accessory case," i.e., an *ejusdem generis* analysis, with what is necessary for an *eo nomine* analysis of "camera case."  Def. Br. at 13.

### C.    Analysis

The Explanatory Notes to Heading 4202 state that "[Heading 4202] covers only the articles specifically named therein *and similar containers*."  World Customs Org.,

Harmonized Commodity Description & Coding Sys., Explanatory Notes, Explanatory

Note 42.02 (emphasis supplied).  The Explanatory Notes provide further that "[s]ubject

to Notes 2 and 3 to this Chapter, the articles covered by the first part of the heading

may be of any material.  The expression 'similar containers' in the first part includes . . .

camera accessory cases."  *Id.*  By identifying articles that are not "camera cases" but

still qualify as "similar containers," the Explanatory Notes to Heading 4202 distinguish

between "camera cases" that are specifically named in a tariff term and "similar

containers."  *Id.*; *see also* Def. Br. at 26.

The court analyzes the *eo nomine* meaning of "camera case" and then turns to

the *ejusdem generis* four-factor test of "similar containers."  The court concludes that

Customs' classification of the camera housings under Heading 4202 is not correct for an

*eo nomine* classification as a "camera case" and not correct as an *ejusdem generis*

classification as a "similar container."

   1. **"Camera cases"**

The court first examines the Customs classification of the subject camera

housings as "camera cases."  In an *eo nomine* analysis, the court first construes the

headings at issue as a matter of law by defining the elements of the heading, *see infra*

Section II.C.1.a; the court then moves to the second classification step, a factual inquiry,

to determine whether the subject merchandise is consistent with those elements, *see*

*infra* Section II.C.1.b.  *See, e.g.*, *R.T. Foods*, 757 F.3d at 1352; *Link Snacks,* 742 F.3d

at 965.  Applying the *eo nomine* analysis, the court concludes that the subject camera

housings are not "camera cases" within the language of the tariff term enumerated in Heading 4202.

### a.   *Eo nomine* meaning of "camera cases"

An *eo nomine* provision describes goods according to their specific name, usually well known in commerce.  Pl. Br. at 9 (citing *Nidec v. United States*, 68 F.3d 1333, 1336 (Fed. Cir. 1995)).  Absent limiting language or contrary legislative intent, an *eo nomine* term includes all forms of the named article.  *Nidec,* 68 F.3d at 1336.  "To discern the common meaning of a tariff term, [the] court consults dictionaries, scientific authorities, and other reliable information sources."  *Mead Corp. v. United States*, 283 F.3d 1342, 1346 (Fed. Cir. 2002) (citing *C.J. Tower & Sons of Buffalo, Inc. v. United States*, 69 CCPA 128, 133, 673 F.2d 1268, 1271 (Fed. Cir. 1982)).  In the instant action, the court consults industry-specific encyclopedias cited by parties, expert testimony submitted by parties, the physical packaging of the subject merchandise and marketing materials submitted by both parties.

### (1)   Lexicographic meaning of "camera case"

Parties in the instant action agree on an encyclopedic source and definition for "camera case" as the term is used in commercial settings and in the photography industry.  Pl. Br. at 10-12; Def. Br. at 12, 17-18; Def. Reply. Br. at 20 (all briefs citing *Focal Encyclopedia of Photography* 90-91 (Leslie Stroebel & Richard D. Zakia eds., 3rd ed. 1993)).  The definition of a "camera case" reads as follows:

> **CASE, CAMERA:** A container for storage and transport of a camera, sometimes with associated equipment.  To retain their performance with the necessary precision, cameras and their accessories need protection while

being stored, transported, and used, especially in the field.  Thus, since the inception of photography, camera cases have been important to the photographer.

The most utilitarian form of case is that intended for professional cameras and equipment. Such cases are generally of a boxlike form with a plain hinged cover and constructed of wood, leather, plastic, or metal. Compartments and padding are usually provided for protection against damage from dropping or other physical abuse. Because considerable weight may be involved, cases are often reinforced at the corners, and are provided with a carrying handle, or handles if excessively large.  Cases for aerial cameras, for instance, may be more like large trunks.

Cases intended for modern hand cameras, such as the 35-mm format, are constructed of leather or plastic and are designed to provide good protection for the equipment without being uncomfortable to carry or inviting attention. Some are designed to retain the cameras by means of a screw that attaches the bottom of the case to the tripod socket.  In turn, this screw may itself be tapped to accept a tripod screw so that the camera and its case can be attached to a tripod.  Other cases retain the camera by means of short leather snap retainers. The flap protecting the lens should be arranged so that there is little likelihood of its flopping into the field of view, and on some cases this flap can be detached.  Larger flaps, or snouts are available to cover longer focal length or zoom lenses.  Shoulder straps are fitted for easy carrying, and small cases for spare rolls of film are often strung on these straps.

Some cases are designed to hold additional lenses, film, and an exposure meter or other camera accessories in addition to one or more cameras. Such cases are usually of more rigid construction and both halves of the top may open out to permit ready access to the equipment.  Cases for extended field use tend to be more of a rugged construction than those to be used by amateur photographers.

Many cases are designed with adjustable compartments so that photographers can customize them to their particular assembly of equipment and accessories.

Well fitted soft leather pouches sometimes serve to protect small cameras, lenses, or exposure meters from dust, moisture, or the effects of handling.

> The need for a separate camera case has been reduced with some small-format cameras that have attached but movable covers over the lens and other parts of the camera.

*Focal Encyclopedia of Photography, supra,* at 90-91.

The court accepts the *Focal Encyclopedia of Photography* definition as a reliable source. *Airflow Tech.,* 524 F.3d at 1291 (holding that the court "may rely upon its own understanding of terms used, and may consult standard lexicographic and scientific authorities"). Parties disagree on the meaning of relevant sections of the *Focal Encyclopedia of Photography. Compare* Def. Br. at 19, *with* Pl. Resp. Br. at 10. For example, with respect to the clause "while being stored, transported, and used, especially in the field," defendant notes:

> [T]he camera housings are waterproof up to 40 or 60 meters below water, are made of impact-resistance polycarbonate plastic, and can withstand physical abuse, including flying debris, gravel, and small rocks. Being action camera housings, they also possess multiple features which protect the camera during storage and transport associated with getting to and being in "the field."

Def. Br. at 19.

For its part, plaintiff interprets this clause as:

> [O]nly for the purposes stated in the definition: to store, protect, organize, and carry cameras and equipment. It is disingenuous to claim that the definition encompasses non-storage uses inclusive of the facilitation of action camera photography.

Pl. Resp. Br. at 10-11. Plaintiff further argues that defendant "incorrectly applies this definition . . . by failing to distinguish between use *as a* 'camera case' and use *with* a camera as a camera housing." *Id.* at 10 (emphasis supplied).

The court understands that a "camera case" can be used in a variety of environments and that its definition contemplates the various settings in which such use may occur.  In all of these settings and for all of these uses, the plain meaning of the encyclopedic definition envisions that, once the user has arrived at the point at which the user wishes to use the camera, the user would alter a part of the camera case to use the camera within.[10]  Unlike the camera cases in the encyclopedic definition, the subject camera housings do not require a user to remove a flap or cover to initiate the use of the action camera.[11]  To the contrary, when the user wishes to use the camera enclosed within the subject merchandise, the subject merchandise is not altered to permit the user to use the camera; the subject merchandise facilitates, enhances or enables the use of the camera.  *See* Pl. Stmt. Facts  ¶ 14; Def. Resp. Pl. Stmt. Facts  ¶

---

[10] Specifically, the encyclopedic definition states in relevant part:

> Other cases retain the camera by means of short leather snap retainers. The flap protecting the lens should be arranged so that there is little likelihood of its flopping into the field of view, and on some cases this flap can be detached.  Larger flaps, or *snouts*, are available to cover longer focal length or zoom lenses.  Shoulder straps are fitted for easy carrying, and small cases for spare rolls of film are often strung on these straps. . . . . The need for a separate camera case has been reduced with some small-format cameras that have attached but removable covers over the lens and other parts of the camera.

*Focal Encyclopedia of Photography*, *supra*, at 91.

[11] Defendant notes that one model of the subject merchandise — the dive housing — comes with a detachable lens cover in its condition as imported.  Def. Suppl. Stmt. Facts at 1-2.  However, this detachable lens cover is an optional accessory used to prevent damage to the *camera housing* — not to the action camera within the housing. Pl. Suppl. Stmt. Facts at 1-2.  In any event, the detachable lens cover imported with a single camera housing model is of little import where the remaining seven models do not come with the camera housing lens cover.  *Id.*; Def. Suppl. Stmt. Facts at 1-2.

14 (stating that "[w]ith the earlier models of HERO action cameras (e.g., HERO3,

HERO3+, HERO4) – which have no display/touch screen on the back, are not

waterproof, durable or mountable by themselves . . . the Camera Housings are

functionally required in order for the action camera to be used as intended in

extreme/wet environments"); Pl. Suppl. Stmt. Facts at 2; Def. Suppl. Stmt. Facts at 2.

Accordingly, the subject merchandise appears inconsistent with the encyclopedic

definition accepted by both parties and consequently, based on that lexicographic

source, with the *eo nomine* meaning of a camera case.

### (2)   Commercial use and denomination of trade

In addition to dictionary and encyclopedic sources, the court takes notice of the

meaning of "camera case," as the term is used in the industry and the context in which it

is used.  *Airflow Tech.,* 524 F.3d at 1291.

Plaintiff argues that the "modern camera industry recognizes a 'camera case' as

involving four elements: it must protect, store, organize and transport a camera/cameras

and their parts, and/or common accessories (*i.e.*, lenses, filters, flashes, lens cleaners)."

Pl. Br. at 12.  Further, "[w]hat the industry commonly recognizes as a 'camera case' is

designed, merchandised, and expected to be used in a manner akin to luggage, and

items that are stored within are not in use during storage."  Pl. Stmt. Facts ¶ 40 (citing

Pl. Ex. N, Russell Decl. ¶¶ 9, 16, 25).  Plaintiff maintains that camera cases can be

"soft-sided" or "hard-sided."  Pl. Stmt. Facts ¶ 41.  "Camera cases are designed to

protect delicate cameras and lenses from drop, dust, dirt, debris and damage from sun

light, humidity and temperature extremes between shoots and are typically made from

polyester/nylon exterior fabric, non-scratch lining, zippers/closures (soft-sided camera cases) or fiberglass-filled nylon or similar plastic materials (hard-sided cases) and feature foam padding on exterior walls and between compartments."  Pl. Stmt. Facts ¶ 42.

Defendant counters that plaintiff's expert has failed to provide the necessary facts to support a conclusion that plaintiff's claimed commercial designation "is a uniform understanding throughout the industry."  Def. Resp. Pl. Stmt. Facts ¶ 39. Defendant notes also that plaintiff has referred to the camera housings as "cases" in its marketing material.  Def. Br. at 23-24.

Defendant also submits as a counterexample an article titled "Canon AW-DC30 All Weather Case for the SD400, SD200, and SD300 Digital Cameras."  Def. Ex. 14, Canon Advertising Copy for the AW-DC30 All Weather Case.  According to defendant, other manufacturers and retailers sell fitted, hard plastic protective coverings similar to GoPro's camera housings as "camera cases."  *Id.*  For example, defendant notes that the Canon AW-DC30 All Weather Case for the SD400, SD200 and SD300 Digital Camera is named and advertised as a "case."  *Id.*; Def. Br. at 24.  Canon's hard plastic weatherproof camera container is advertised with the following copy: "[y]ou can use this case to take underwater shots at depths of down to 3 meters (9.8 feet)" and "it's also ideal for taking worry-free pictures in the rain, at the beach, or on the ski slopes."  Def. Ex. 14.  Defendant adds that another action camera manufacturer, the Akaso company, sells a "waterproof case" that looks similar to the GoPro housings and is described in its advertising literature as having the following attributes: "Waterproof Case Underwater

Housing for AKASO Action Camera.  Delivers maximum image sharpness above and below water."  Def. Br. at 24-25; Def. Ex. 15, AKASO Camera Case Advertising Copy. Finally, defendant relies on advertising from other camera manufacturers and retailers to show that the terms "housing" and "case" are interchangeable.[12]  Def. Br. at 25.

The court concludes that the *eo nomine* common commercial meaning of "camera case" is comprised of the listed qualities identified in the *Focal Encyclopedia of Photography* definition and the other sources noted: namely, a container for storage and transport of a camera.  Accordingly, the subject merchandise would need to meet these listed properties of a camera case to be properly classified under Heading 4202.

### b.    Subject merchandise as "camera cases"

The court concludes — considering the reliable sources above to elucidate the meaning of "camera case" — that the subject camera housings do not fit the meaning of the tariff term "camera case" as enumerated in Heading 4202.  The subject merchandise fails to meet the elements of storage, organization and carriage of the cameras within.  In addition, the subject merchandise improves the functionality and usability of the GoPro action cameras when they are enclosed within the subject merchandise — a purpose not enumerated in the encyclopedic definition proffered by both parties for a camera case.  Specifically, the most significant properties of the

---

[12] The court notes that neither the characterization of other manufacturers of different merchandise, nor Customs' classification of different merchandise, "bear on this court's 'independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS terms.'"  *Allstar Marketing Grp., LLC v. United States*, 41 CIT __, __ n.22, 211 F. Supp. 3d 1319, 1335 n.22 (2017) (quoting *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005)).

camera housings are those that enable or enhance the use of the camera: for example,

(1) the waterproof nature of the majority of the camera housings for use in various

environments,[13] Pl. Stmt. Facts ¶¶ 8, 14, 27; (2) the "spring-loaded function buttons,"[14]

*Id.* ¶ 20; Pl. Br. at 2; and (3) the thin layer of foam to ensure a tight fit and stabilization of

the camera inside the housing, Pl. Stmt. Facts ¶ 21.  Parties agree that "[t]he Camera

Housing is principally designed, expected to be used and marketed as a device that

adds functionality to the camera."  Pl. Stmt. Facts ¶ 33; Def. Resp. Pl. Stmt. Facts ¶ 33.

In its marketing materials and packaging, GoPro refers to the subject camera

housings as "housings."  *See generally* Pl. Physical Exs.; Pl. Ex. B, Product Booklet; Pl.

Ex. C, GoPro's Marketing Materials.  Plaintiff notes also that the *Focal Encyclopedia of

Photography* specifically provides for waterproof housings within the definition of an

"underwater camera"[15] to distinguish "housings" from "camera cases."  Pl. Resp. Br. at

11 (citing *Focal Encyclopedia of Photography*, *supra*, at 86).

---

[13] As parties note, the skeleton housing is the lone housing that lacks waterproof
capabilities.  *See* Pl. Physical Ex. A5; Pl. Ex. B, Product Booklet.  For those camera
housings that advertise their waterproof properties, they incorporate silicon gaskets to
protect the action camera against the water pressure.  Pl. Stmt. Facts ¶ 28.

[14] The camera housing incorporates spring-loaded buttons that allow for the operation of
all action camera controls.  Pl. Stmt. Facts ¶ 20.  If not for the springs, the buttons could
be activated when underwater at compression depths.  Pl. Br. at 2.  The spring-loaded
buttons mate to the corresponding buttons on the camera within.  *Id.*; Pl. Stmt. Facts ¶
20.

[15] In relation to underwater photography, the *Focal Encyclopedia of Photography*
specifically distinguishes waterproof "housings" from "camera cases" by separately
describing a waterproof housing that allows for operation of the conventional camera
while under water.  Pl. Resp. Br. at 11.  "Underwater camera" is defined in relevant part:
(footnote continued)

Defendant contends that the advertised name that GoPro uses for the subject merchandise — housing — is interchangeable with the word "case," and that the synonymity of the terms demonstrates that the camera housings at issue fit squarely within the *eo nomine* term "camera case" of Heading 4202.  Def. Br. at 22-23 (quoting the *Merriam-Webster Dictionary* (online version), which defines "housing" as "something that covers or protects: such as a *case* or enclosure (as for a mechanical part or an instrument)" (emphasis supplied)).  The court finds this argument unpersuasive — the terms "case" and "housing" may overlap, but the two are neither interchangeable nor synonymous.

For the foregoing reasons, the court concludes that the subject camera housings are not properly classified within the *eo nomine* provision for "camera cases" under Heading 4202.

### 2.   "Similar containers"

"Under the rule of *ejusdem generis*, which means 'of the same kind,' where an enumeration of specific things is followed by a general word or phrase, the general word or phrase is held to refer to things of the same kind as those specified."  *DRI Indus., Inc. v. United States*, 11 CIT 97, 102, 657 F. Supp. 528, 532 (1987), *aff'd*, 832 F.2d 155

---

A photographer can use a general camera that is placed in a special water-tight housing made from either plastic or aluminum and constructed to operate to only a specific depth. All of the normal functions of the conventional camera are attached to an extension apparatus that passes through to the outside of the housing to allow the diver access to some of the controls.

*Focal Encyclopedia of Photography*, *supra*, at 86.

(Fed. Cir. 1987) (citation omitted).  As applicable to classification cases, *ejusdem generis* requires that the imported merchandise possess the essential characteristics or purposes that unite the articles enumerated *eo nomine* to be classified under the general word or phrase.  *Sports Graphics, Inc. v. United States*, 24 F.3d 1390, 1392 (Fed. Cir. 1994) (citing *Nissho-Iwai Am. Corp. v. United States*, 10 CIT 154, 157, 641 F. Supp. 808, 810 (1986)).

"The principle of *ejusdem generis* requires anything falling under the general term 'or the like' to possess the same essential characteristic of the specific enumerated articles."  *Deckers Corp. v. United States.*, 532 F.3d 1312, 1316 (Fed. Cir. 2008) (citing *Airflow Tech., 524 F.3d at 1292).  The phrase "or the like" means "the same, or very similar to."  *Id.*

"The canon of *ejusdem generis* 'limits general terms [that] follow specific ones to matters similar to those specified.'"  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 163 n.19 (2012) (citing *CSX Transp., Inc. v. Alabama Dept. of Revenue*, 562 U.S. 277, 294-95 (2011) (alteration in original)); *see also Aves. in Leather,* 423 F.3d at 1332 ("In classification cases, *ejusdem generis* requires that, for any imported merchandise to fall within the scope of the general term or phrase, the merchandise must possess the same essential characteristics or purposes that unite the listed exemplars preceding the general term or phrase.").

In the case of Heading 4202, the Federal Circuit has held that applying the term "similar containers" requires an *ejusdem generis* analysis to determine if the goods are

"of the same kind" as those listed in the heading.  *Totes, Inc. v. United States*, 69 F.3d

495, 498 (Fed. Cir. 1995).

The USCIT has noted that the items listed in defendant's proposed definition of

"container" — "box, crate, can, jar" — "all require some concurrent and relatively simple

physical act to gain access to the receptacle (i.e., twisting a lid, lifting a cover)."  *Otter*

*Prods., LLC v. United States*, 39 CIT __, __, 70 F. Supp. 3d 1281, 1289 (2015), *aff'd*,

834 F.3d 1369 (Fed. Cir. 2016).  In *Otter Products*, the Federal Circuit affirmed that, in

contrast, the cell phone cases subject to review in that case (Otterbox cases for cell

phones) "are specifically designed for and fit snugly over particular electronic devices

and do not require an action to open or uncover the item."  *Id.*; *see also Otter Prods.*

*CAFC*, 834 F.3d at 1369 (affirming the USCIT decision).  To that end, the court noted

that "it is more common to think of the cases as an addition/accessory to the electronic

device which can be added to or removed at the consumer's liking."  *Otter Prods.*

*CAFC*, 834 F.3d at 1377 (quoting *Otter Prods.*, 39 CIT at __, 70 F. Supp. 3d at 1289-

90).  The Federal Circuit and the USCIT further found that the cases only "minimally

resemble containers."  *Id.* (quoting *Otter Prods.*, 39 CIT at __, 70 F. Supp. 3d at 1292).

Further, in determining whether subject merchandise meets the "similar

containers" classification, the Federal Circuit has held that "the common characteristic

or unifying purpose of the goods in Heading 4202" consists of:  (1) organization; (2)

storage; (3) protection; and (4) carriage of another item or items.  *Otter Prods. CAFC,*

834 F.3d at 1377-78 (quoting *Aves. In Leather*, 423 F.3d at 1332); *see Otter Prods.*, 39

CIT at __, 70 F. Supp. 3d at 1290.  The Federal Circuit clarified that "there is no

requirement that the subject merchandise meet all four characteristics to qualify as a 'similar container' under Heading 4202," *Otter Prods. CAFC,* 834 F.3d at 1378:

> Courts should consider the four characteristics collectively and then determine whether, in light of those considerations, the classification would lead to an inconsistency.  If, for example, an item met only one of the four characteristics, it almost certainly would not qualify as a "similar container" under Heading 4202.  Allowing a single factor to satisfy the inquiry would, in almost all conceivable scenarios, render the scope of "similar containers" so broad that it would lead to absurd results and make consistent application of the standard all but impossible.

*Id*. at 1378-79.

The court considers the four factors listed by the Federal Circuit, individually and collectively, and concludes that the purpose of the subject merchandise is not to "organize," "store," or "carry" so as to classify the merchandise as "similar containers" under Heading 4202.[16]

### a.   Organization

The court concludes that the subject camera housings, as entered, are not designed to accommodate multiple items, and do not meet the element of "organization" to constitute one of the "similar containers" envisaged by Heading 4202. Plaintiff states that the subject camera housings are not designed to put multiple goods into long-term storage for the purpose of their organization and transport.  Pl. Stmt. Facts ¶¶ 33, 43-46.  According to plaintiff, "[i]t is undisputed that the principal purpose of

---

[16] In the USCIT's decision in *Otter Products*, which the Federal Circuit affirmed, the USCIT stated: "coverings which minimally resemble containers, serve a protective purpose, and may at times serve some carrying purpose, while allowing full functionality of the enclosed merchandise are not 'similar containers.'"  *Otter Prods.*, 39 CIT at __, 70 F. Supp. at 1292-93.

the camera housing is for its functional use with the action camera during filming."  Pl.

Br. at 26 (citing Pl. Stmt. Facts. ¶ 33).  Plaintiff then refers to the CASEY camera cases

(physical exhibit A6) in contrast to the camera housings and states that "[t]he difference

between the CASEY [cases] and the Camera Housings boils down to function and is

readily apparent from the character of the goods themselves."  *Id.*

Defendant highlights that the camera housings encapsulate items in addition to

the HERO action camera, such as anti-fog inserts and various modular add-on camera

parts called "BacPacs."  Def. Br. at 30.  For example, the housings at issue come with

alternate back doors which allow the housings to contain a Battery BacPac and an LCD

Touchscreen BacPac.  Def. Br. at 31.  According to defendant, the alternate back doors

"carry out the function of organizing by containing these two items in an orderly fashion

during carriage."  *Id.*  Accordingly, defendant argues that "[t]he GoPro housings at issue

. . . are designed with an organizational functionality and purpose."  *Id.*

The Federal Circuit has explained that "organization requires at least the

possibility of storing multiple items. . . . [T]he cases here contain a single item: an

electronic device."  *Otter Prods. CAFC*, 834 F.3d at 1379.  In the instant matter, the

housings are constructed so as to allow for the alteration to their back doors to add on

modular Battery BacPacs or LCD Touchscreen BacPacs, which clip onto the action

camera and require the enlargement of the camera housing to accommodate the

supplemental accessory.  Def. Br. at 31; Pl. Stmt. Facts ¶ 31; Def. Stmt. Facts ¶¶ 13,

17, 21 33, 34.  To add these additional elements to the action cameras, however, the

camera housings must be altered with additional backdoors to facilitate the functions of

the touchscreen and additional batteries.  Pl. Stmt. Facts ¶ 31; Def. Stmt. Facts ¶ 13; Pl.

Resp. Def. Stmt. Facts ¶ 13 (adding that "[t]he BacPac module plugs into the action

camera via physical and electrical ports becoming a part of the camera before

placement into the housing").  The ability of the housing to accommodate these

enhancing additions serves to increase the functionality of the housings such that they

in turn enhance the utility and versatility of the action cameras within.  Any

organizational capabilities in this respect are secondary to the functions of enhancing

the operation of the action cameras.

Defendant argues that anti-fog inserts are additional accessories that the camera

housings are intended to organize.  Def. Br. at 29-31.  The court disagrees.  The anti-

fog inserts serve the purpose of enhancing the usability of the camera devices enclosed

in the camera housings.  Pl. Ex. N, Russell Decl. ¶ 42 (stating that, "[i]f the user is using

a waterhousing, the user might also choose to add tiny strips of desiccant (anti-fog

inserts), which function while capturing video in wet/humid conditions to remove

moisture"); Pl. Stmt. Facts ¶ 30 ("GoPro Anti-Fog Inserts are shipped in a durable

plastic ('Ziploc'-type) bag.") (citing Pl. Physical Ex. A7, GoPro Anti-Fog Inserts; Pl. Ex.

N, Russell Decl., ¶¶ 42-43; Pl. Ex. F, Russell Dep. at 60:5-61:12, 90:19-91:12, 105:17-

106:8).  The inserts are placed within the camera housing *when the camera is in use* in

its housing.  Further, the inserts must be stored in their own containers — containers

*entirely separate* from the housings whose sole purpose is to *store* anti-fog strips until a

user wants to use one on the camera when it is being used within its housing.  Def.

Stmt. Facts ¶¶ 31-32; Pl. Resp. Def. Stmt. Facts ¶¶ 31-32.  The strips must be stored in

these separate containers to preserve them for use with the camera in the camera housing.  Pl. Resp. Def. Stmt. Facts ¶ 31; Def. Resp. Pl. Stmt. Facts ¶ 30.  The anti-fog inserts are useable only when the camera is being used *in its housing* (the state of being in its housing makes the likelihood of fog buildup greater).  Def. Stmt. Facts ¶¶ 31-32; Def. Resp. Pl. Stmt. Facts ¶ 30.  In sum, the possibility of inserting anti-fog strips — along with the action camera — into the camera housing serves to enhance the usability of the camera rather than to organize.

In contrast to the subject camera housings, the court notes, for example, the distinct organizational purpose of the CASEY cases.  Pl. Physical Ex. A6, CASEY Camera Case.  The CASEY cases are designed to accommodate action cameras, housings and accessories by way of slots and space that are customizable to correspond to the size of the item that is intended to be placed within.  *Id.*; Pl. Ex. N, Russell Decl. ¶¶ 29-30.  The camera housings, for their part, are built to accommodate solely the action cameras, and minimal space for anti-fog strips, to facilitate the action cameras' usability in various action environments.  Pl. Stmt. Facts ¶ 30; Def. Resp. Pl. Stmt. Facts ¶ 30.

In conclusion, the camera housings do not meet the factor of "organization" for which "similar containers" under Heading 4202 are intended.

### b.   Storage

The court next considers whether the subject camera housings meet the "storage" factor of "similar containers."  The unifying feature of the articles listed in the first clause of Heading 4202 is that the objects enclosed within can be accessed and

used only if the container is modified, opened or removed — use and storage are temporally mutually exclusive.  In sum, every article listed in Heading 4202 is one that is designed to enclose an object within when the object is not *in use*.

Plaintiff argues that "the camera housings are not only designed to allow a user to make full use of the action cameras, but they are also designed to enable and enhance that use."  Pl. Br. at 19 (citing Pl. Stmt. Facts ¶¶ 19-21, 24-25, 32).  Plaintiff asserts further that the action camera "cannot function in the specific dynamic environments it is designed to be used in (e.g., underwater or mounted on the side of a race car or dropped in a volcano) without the Camera Housing."  *Id.*   Plaintiff claims that "[i]t is undisputed that the camera housings are designed for use with an action camera such that the camera retains 100 percent of its functionality and interactivity while inside the camera housing."  *Id.*

Defendant counters with two points.  First, defendant asserts that "[u]nlike the products in *Otter Products*, the Hero action cameras do not retain 100 percent functionality when inserted into the GoPro waterproof housings."  Def. Br. at 32.  Defendant argues specifically that "[w]hen the Hero action cameras are enclosed within the GoPro waterproof housings, the audio quality is degraded and muffled."  Def. Br. at 32 (citing Def. Ex. 16, Russell Dep. at 56, 57, ECF No. 33-13).  Second, defendant states that when the housings are not actually being used, one of their functions is to store the Hero action camera until the user intends to interact with the device again. Def. Br. at 31.

The primary features of the camera housings are not for the purpose of "storing" the cameras within.  To the contrary, the camera housings are built to promote the usability and functioning of the cameras in the various environments for which they are designed.  Pl. Suppl. Stmt. Facts at 2.  Two examples of the functional purposes of the camera housings are the "Camouflage Housing," and the "Super Suit Housing."  The former is camouflaged so as to mask its use in "woodland environments.  Its Realtree Xtra pattern blends perfectly year-round in a variety of habitats."  Pl. Ex. C, GoPro's Marketing Materials, at GoPro 000424.  Further, "[t]he QuickClip lets you attach [the camo housing] to a backwards baseball cap or other 3mm to 10mm thick object."  *Id.* The pattern displayed on the camera housing and the clip enabling attachment to a user's hat emphasize the functional purpose of the camera housing.  That GoPro *markets* the camera housing for the purpose of clipping and camouflaging the camera and has *constructed* the camera housing to facilitate its use in this manner weighs against finding that this and other camera housings serve primarily a "storage" purpose.

The Super Suit Housing is designed for use in a different setting than its camouflaged twin, but the court reaches a similar conclusion regarding storage.  The Super Suit Housing is for "extreme outdoor activities and deep-water diving" and includes a "flat glass lens [that] delivers maximum image sharpness above and below water."  Pl. Ex. C, GoPro's Marketing Materials, at GOPRO 000420.

Defendant argues that the muffled audio of the action cameras in this context weighs against finding "100 percent functionality."  Def. Br. at 32-33.  The parties do not agree on the question of whether one or more of the housings causes some

degradation of the camera's audio functions.  *See* Def. Stmt. Facts ¶ 37; Pl. Resp. Def.

Stmt. Facts ¶ 37; Def. Suppl. Stmt. Facts at 2-3; Pl. Suppl. Stmt. Facts at 2.  However,

even presuming that there were some diminishment in the audio as defendant argues,

the court does not find defendant's argument persuasive that this diminishment would

mean that the housings provided a "storage" function.  Def. Br. at 32.  The action

cameras would not be *functional* underwater in the absence of the housing.  Pl. Suppl.

Stmt. Facts at 2; Pl. Ex. F, Russell Dep. at 101:3-25.  Muffled audio does not suffice to

negate functionality within the scope of the term delineated within *Otter Prods.*, 39 CIT

at __, 70 F. Supp. 3d at 1294 (noting that "retaining 100 percent functionality, is

inconsistent with 'storing'").

Another factor weighing against a determination that camera housings serve to

"store" is the presence of spring-loaded buttons that are mated with corresponding

buttons on the action camera to control its functions — such as starting the shutter and

turning the camera on and off — while the camera is housed.  Pl. Stmt. Facts ¶ 20

(citing Pl. Ex. E, Thomas Dep. at 25:11-14; 35:18-22, 119:2-10; Pl. Ex. F, Russell Dep.

at 31:4-15).  The spring-loaded buttons constitute features that enable the user to

continue using the action camera while it is encapsulated within the housing — a

characteristic of the subject camera housings that weighs heavily against a

determination that they achieve a "storage" purpose.  *Otter Prods.*, 39 CIT at __, 70 F.

Supp. 3d at 1294.

The court concludes that the increased functionality of the action cameras when enclosed within the camera housings does not support a conclusion that the camera housings meet the "storage" factor of "similar containers," under Heading 4202.

### c.   Protection

Plaintiff states that the GoPro camera housings are "protective" in nature, but that they do not have the same protective character as a camera case.  Pl. Br. at 24. Plaintiff argues that the "expert testimony establishes that that the optically-coated lens assemblies of the camera housings can be damaged, rendering the GoPro action camera system unusable."  *See* Pl. Resp. Br at 7 (citing Pl. Stmt. Facts ¶¶ 36-37).

Defendant argues that the "features of camera housings demonstrate the protection they provide for the camera contained inside."  Def. Br. at 35.  For instance, the waterproof camera housings protect against moisture and are waterproof up to 40 or 60 meters below the surface of the water; the camera itself is not waterproof and unable to operate underwater without the housing.  Pl. Stmt. Facts ¶¶ 8, 14, 27.  Defendant also submits for consideration plaintiff's own marketing descriptions of the use and contemplated settings of use of the camera, recounting that:

> GoPro users have proven their GoPro housings enable their cameras to survive some truly amazing scenarios.  From falling out of planes, falling off cars at high speeds, intentionally being placed at the base of a rocket launch, or simply being lost in the surf for several years before being recovered, GoPro has built a reputation for building incredibly robust products that survive extremely demanding and violent situations.

Def. Ex. 10, Cousteau Product Requirements Document at GOPRO 008937, ECF No. 33-8.

The court does not find plaintiff's counterarguments on this point persuasive and is perplexed as to why plaintiff considered it useful to a straightforward discussion of the facts in this case let alone probative even to present those arguments — again, let alone to present them repeatedly.  The features of the camera housings that highlight their protective qualities are the waterproof nature of the housing and the impact-resistance of the plastic.  The court concludes that protection of the camera during use, especially in compromising conditions, is a purpose of the camera housing.

### d.   Carriage

Finally, the court considers whether the camera housings fulfill the "carriage" factor of "similar containers."  "Carry" is defined as "to hold or support while moving." *Webster's New World College Dictionary* 215 (3d ed. 1988).

Plaintiff argues that the camera housing is not intended to facilitate carriage.  Pl. Resp. Br. at 8.

Defendant presents three arguments in support of its conclusion that the housings perform a carriage function: (1) the camera housings "are designed with a carrying functionality and purpose," Def. Br. at 38;  (2) the housings have the features necessary to accommodate *accessories* that will allow for carriage — for example, a

selfie stick, which attaches to the housing and is sold separately from the housing,[17] *Id.*

at 36; and (3) the "housings are all capable of being carried by hand or in a variety of

ways enabled by their mounting features."  Def. Br. at 36.

Plaintiff states that "the undisputed facts are that the camera housings lack

carrying handles – and any optional handles (mounts) which might be applied after

purchase are for the purpose of filming (not to facilitate transport during storage)."  Pl.

Resp. Br. at 2.  The camera housings themselves may provide minimal carrying

functionality, *see Otter Prods.*, 39 CIT at __, 70 F. Supp. 3d at 1290-91; however, they

do not serve a "carriage" function, within the meaning of "similar containers" under

Heading 4202.

To conclude the court's consideration of Customs' classification under Heading

4202, the camera housings do not meet the necessary elements of "storage,"

"organization" and "carriage" to qualify as "similar containers" under Heading 4202, nor

---

[17] Defendant references:

> [A] wide variety of different GoPro conveyance accessories suitable for
> different activities, which are designed to fit with the two-fingered mounting
> surface on the GoPro housings at issue, except for the Wrist Housing Super
> Suit Housing. . . . Some of the mounts which are part of the GoPro eco-
> system of action photography mounts include selfie-sticks identified in the
> Def. Ex. 17, GoPro Catalog at GOPRO 6281-6308, as 'Shorty'
> (GOPRO6300), 'The Handler,'(GOPRO6300), 'Hand +Wrist Strap,'
> (GOPRO6300), 'El Grande' (GOPRO6301) and '3-Way' (GOPRO6303);
> helmet mounts identified in the GoPro Catalog as 'Head Strap + Quickclip'
> (GOPRO6301), 'Helmet Front + Side Mount' (GOPRO6302), and body
> mounts identified in the GoPro Catalogue as the 'Chesty' (GOPRO6301).

Def. Stmt. Facts ¶ 30.

do the camera housings fall under the *eo nomine* definition of "camera cases" of the same heading.  Accordingly, the court next considers Heading 8529 to ascertain whether the subject merchandise is appropriately classified under that provision of the HTSUS.

### III.   Classification of the subject camera housings under Heading 8529

#### A.   Legal framework

The starting point for every classification case is the tariff schedule.  The court begins its inquiry by consulting the GRI.  *Carl Zeiss*, 195 F.3d at 1379.  "[C]lassification is determined according to the terms of the headings and any relative section or chapter notes."  GRI 1.  Additionally, the court may look to the Explanatory Notes to help construe the relevant chapters where appropriate.  *Roche Vitamins, Inc. v. United States*, 772 F.3d 728, 731 (Fed. Cir. 2014).  While the "Explanatory Notes are not legally binding, [they] may be consulted for guidance and are generally indicative of the proper interpretation of a tariff provision."  *Id*. (citing *Motorola, Inc. v. United States*, 436 F.3d 1357, 1361 (Fed. Cir. 2006)).

Qualification for a parts provision may involve a two-pronged approach under the *Willoughby* and *Pompeo* cases.  *Bauerhin Techs. Ltd. Pshp. v. United States*, 110 F.3d 774, 778-79 (Fed. Cir. 1997) (citing *United States v. Willoughby Camera Stores, Inc.*, 21 CCPA 322 (1933) and *United States v. Pompeo*, 43 CCPA 9, C.A.D. 602 (1955)).  Under *Willoughby*, a product may be considered a part if it was necessary to the intended operation of the good to which it was attached.  *Willoughby,* 21 CCPA at 324.  In *Pompeo*, the court built on the *Willoughby* analysis when it held that a "part" was an

item "dedicated irrevocably" to its use with the product for which it was created.

*Pompeo,* 43 CCPA at 13-14.

Rule 1(c) of the Additional U.S. Rules of Interpretation ("ARI") states that "a provision for parts of an article covers products solely or principally used as a part of such articles but a provision for 'parts' or 'parts and accessories' shall not prevail over a specific provision for such part or accessory."  ARI R. 1(c).

## B.    Positions of the parties

Plaintiff contends that the camera housing is an integral part of the GoPro action camera within Heading 8529, which provides for, inter alia, "parts" suitable for use solely or principally with digital cameras of Heading 8525, subheading 8529.90.86.  Pl. Br. at 5, 27-31; Pl. Ex. F, Russell Dep. at 101:4-9.  According to plaintiff, the camera housings are prima facie classifiable under Heading 8529 as a "part" of a GoPro action camera as: (1) the housings are designed solely and exclusively as a part of the GoPro action camera system; (2) the housings hold no function outside of their use within that system; and (3) the cameras are not intended for independent use without the housings. Pl. Br. at 27; Pl. Ex. E, Thomas Dep. at 120:1-5; Pl. Ex. F, Russell Dep. at 93:14-18, 101:4-9.

Defendant's position is that the parts provision is inapplicable because Heading 4202 is a specific provision that applies to the subject merchandise.  Def. Br. at 38.

## C.    Analysis

The court concludes that the GoPro camera housings are properly classified under Heading 8529.  In reaching this conclusion, the court relies on the article

description issued in the tariff terms of the HTSUS and their accompanying Chapter

Notes, the Explanatory Notes accompanying the HTSUS for guidance on interpreting

the breadth and scope of the heading, and Federal Circuit and Customs Court cases

that address which elements the court may weigh in determining whether a good

constitutes a "part" within the meaning of the HTSUS.

Explanatory Note 85.29 states: "[s]ubject to the general provisions regarding the

classification of parts . . .,[18] this heading covers parts of the apparatus of the five

---

[18] The General Chapter Note, Section XVI(2) states in relevant part:

> [P]arts of machines (not being parts of the articles of heading 84.84, 85.44, 85.45, 85.46 or 85.47) are to be classified according to the following rules:

> (a) Parts which are goods included in any of the headings of Chapter 84 or 85 (other than headings 84.09, 84.31, 84.48, 84.66, 84.73, 84.87, 85.03, 85.22, *85.29*, 85.38 and 85.48) are in all cases to be classified in their respective headings;

> (b) Other parts, *if suitable for use solely or principally with a particular kind of machine, or with a number of machines of the same heading* (including a machine of heading 84.79 or 85.43) *are to be classified with the machines of that kind or in heading* 84.09, 84.31, 84.48, 84.66, 84.73, 85.03, 85.22, *85.29* or 85.38 as appropriate.  However, parts which are equally suitable for use principally with the goods of headings 85.17 and 85.25 to 85.28 are to be classified in heading 85.17, and parts which are suitable for use solely or principally with the goods of heading 85.24 are to be classified in heading 85.29;

> (c) All other parts are to be classified in heading 84.09, 84.31, 84.48, 84.66, 84.73, 85.03, 85.22, *85.29* or 85.38 as appropriate or, failing that, in heading 84.87 or 85.48.

Gen. Chapter Note, Section XVI(2) (emphasis supplied) (footnote continued).

preceding headings.  The range of parts classified here includes . . . [c]ases and

cabinets specialised to receive the apparatus of headings 85.25 to 85.28."  Explanatory

Note 85.29.  The court notes that the Explanatory Notes accompanying the HTSUS

headings are not legally binding, but they provide guidance and offer clarity as to the

scope and breadth of the tariff provisions they accompany.  *E.T. Horn Co. v. United*

*States*, 367 F.3d 1326, 1329 (Fed. Cir. 2004).  In the instant circumstance, the court

concludes that the camera housings are "specialised to receive" the GoPro action

cameras,[19] as the phrase is used in the Explanatory Notes.

The court's conclusion is supported by evidence submitted by both plaintiff and

defendant that shows that each GoPro camera housing is specially designed to enclose

only certain models of GoPro action cameras.  Specifically, plaintiff submitted to the

record a products booklet with a correlation table, which details the description of each

---

Section Note 2 provides that:

> In general, parts which are suitable for use solely or principally with
> particular machines or apparatus (including those of heading 84.79 or
> heading 85.43), or with a group of machines or apparatus falling in the
> same heading, are classified in the same heading as those machines or
> apparatus subject, of course, to the exclusions mentioned in Part (I)
> above. Separate headings are, however, provided for:
>
>> (H) Parts of apparatus of headings 85.25 to 85.28 (heading
>> 85.29).

*Id.*, Section Note 2.

[19] Plaintiff states, and defendant does not dispute, that the GoPro action cameras that
are used within the subject camera housings are properly classified under Heading
8525.  Pl. Br. at 5-6.

camera housing and the compatibility of each housing with each respective camera.  Pl.

Ex. B, Product Booklet.  As plaintiff states, "the camera housings enclose a single

electronic device — the GoPro HERO action camera — and are form-fitting and

bespoke to those camera models that they are designed for."  Pl. Stmt. Fact ¶ 16

(citation omitted).  The bespoke nature of the camera housings supports their

designation as "parts" of the action cameras for which they are designed.  Further, the

court notes that the action cameras, when used for the purpose for which they were

designed, namely action, are not built for use independent of a camera housing model.

Pl. Stmt. Facts ¶ 12; Def. Resp. Pl. Stmt. Facts ¶ 12; *Willoughby*, 21 CCPA at 324 ("It is

a well-established rule that a 'part' of an article is something necessary to the

completion of that article.  It is an integral, constituent, or component part, without which

the article to which it is to be joined, could not *function as such article*.") (citations

omitted).

In its submissions to the court, plaintiff included a newer version of the GoPro

action camera (HERO 9) and a description of its features and components.  *See* Pl.

Physical Ex. A11; Pl. Stmt. Facts ¶ 15.  The HERO 9 integrates the features and

components (waterproofing, protection from dirt and dust) that the camera housings

were designed to accomplish with the older version of the action camera.  Pl. Stmt.

Facts ¶ 15; Def. Resp. Pl. Stmt. Facts ¶ 15.  The fact that the newer version was

modeled to incorporate some of the features of the camera housing as integrated with

the action camera itself weighs further in favor of determining that the camera housings

constitute "parts," since their function and purpose were ultimately integrated *as parts* of the later action camera model.

The court turns next to decisions of the courts that support further the conclusion that the camera housings are correctly classified as "parts."  The Federal Circuit in *Bauerhin* applied the *Pompeo* approach in assessing whether canopies for car seats might be "parts" of those seats pursuant to HTSUS classification.  *Bauerhin,* 110 F.3d at 779 (citing *Pompeo*, 43 CCPA at 13).  The Federal Circuit determined that while not absolutely necessary for the intended function of the car seat, a canopy was nevertheless a part for the seat because (1) it "serve[d] no function or purpose that is independent of the child safety seat" and also (2) the canopies were "undisputedly designed, marketed, and sold to be attached to the child safety seats."  *See id.* at 779.

Consistent with the Federal Circuit's analysis of "parts" in *Bauerhin*, the GoPro camera housings are designed and sold for exclusive use with the GoPro cameras.  *Id*. (stating that "[t]he canopies in this case are dedicated solely for use with the child safety seats. They are neither designed nor sold to be used independently.  Therefore, the canopies are properly considered parts under the HTSUS.").  Similarly, in the instant action, the camera housings have essentially no utility in the absence of the cameras that they encapsulate, and parties do not dispute that the camera housings are not sold for any use independent from the GoPro action camera system.  Pl. Stmt. Facts ¶ 26; Def. Resp. Pl. Stmt. Facts ¶ 26; *see Bauerhin*, 110 F.3d at 779 ("[A]n imported item dedicated solely for use with another article is a 'part' of that article within the meaning

of the HTSUS."); *Pompeo*, 43 CCPA at 13.  As such, the GoPro camera housings in this case are properly classified under Heading 8529 as "parts."

**IV.    GoPro's alternative classification of the camera housings in subheading 3926**

**A.    Legal framework**

Plaintiff argues in the alternative that the subject merchandise should be classified in subheading 3926.90.99:

3926

> Other articles of plastics and articles of other materials of headings 3901 to 3914:
>
> * * *
>
> > 3926.90 Other:
> >
> > * * *
> >
> > > 3926.90.99 Other . . . . . . . . . . . . . . . . . . . . . . . . .5.3% ad valorem

HTSUS 3926.90.99.

**B.    Analysis**

The court concluded that the correct classification for the subject camera housings is as "parts" under Heading 8529.  Accordingly, the court does not consider plaintiff's alternative proposed classification.

Consol. Court No. 20-00176                                                    Page 54

## CONCLUSION

* * *

For the foregoing reasons, plaintiff's motion for summary judgment is **GRANTED**.

Defendant's cross motion for summary judgment is **DENIED**.  Judgment will enter

accordingly.


/s/      Timothy M. Reif
Timothy M. Reif, Judge

Dated:   December 28, 2023
         New York, New York